Michael Piper for Appellate Linda Ton. Thank you for hearing this. I know you have a busy schedule and very significant matters going on. Also, thanks to the clerk's office. They're very helpful in getting through all the little requirements that we have along the way. We like to hear that. I'd like to compliment them. We agree. It's been kind of challenging the last couple of years, COVID, things like COVID, et cetera, getting all this done. Hopefully, nothing distracted from the issues. I think there are two core issues in this matter that we have to deal with. One is the bankruptcy code. The Whitney loans, I think it's clear, are not community debts. Now, they end up being treated as community debts. These are the loans taken after the divorce? Yes. The divorce was in 2012, and there were a series of loans. They started out, one loan was there before the divorce in 2011, $1.8 million. The divorce happened in 2012. Shortly after the divorce, Mr. Ton pled guilty to a felony for payroll tax fraud. He then took out a loan in 2013. After the divorce, he took out a loan in 2013. I'm sorry, he didn't take out the loan. Abe's Boat Rentals took out the loan. The taxes, they were payroll taxes. Mr. Ton was the responsible person because he controlled the company, but the taxes were actually owed by Abe's, and then he was liable for the 100% penalty because the taxes were withheld and there was a scheme and they didn't get paid. So, after the divorce, he took out a loan in 2013 to pay, I'm sorry, Abe's took out a loan in 2013 to pay the taxes. That loan was guaranteed by Mr. Ton, but he was not the maker of the loan. Linda Ton had taxes, community property. I don't think they were. They were the corporate taxes, and that's an issue. We have a related case with the partition where that tax issue is even more prominent in it. It's set for argument next month. My position is that case should have never been heard because under the Provenza case, once you've got a plan in place, you don't do a separate partition. I might get to that in a second. There was no effort to consolidate the two, this case and that case. There's no effort to consolidate them. I don't think they can be consolidated. One of my former partners called this thing a procedural nightmare because the way the bankruptcy works, we could end up having three or four appeals going on at the same time. You have these adversary proceedings. The partition started out in state court in 2012. It got removed to the bankruptcy case once this was filed. Judge Magner instructed us to remove the case to here, to the bankruptcy court. But it had its own life as an adversary proceeding and its own trial. I made note, and so has my opponent, in our filings, that there are this related case coming up. Again, I think the Provenza case says you don't do that. Provenza was a case that went on for several years, very contentious, kind of like this one. They were trying to partition. There were condos, a lot of money involved, a lot of issues. And what Judge Brown ultimately said, and it went up to this court and got affirmed, was all that is subsumed into the plan confirmation. You no longer conduct the separate partition proceeding. The partition case was retried. It was tried once a couple of years, almost two and a half years ago. It was retried after the plan was confirmed. When I say retried, it was basically the same evidence resubmitted in there. And then a separate judgment was rendered. So we've had to appeal that case, I think, separately. If it can be consolidated, that's fine. That's kind of one of my questions. How does this panel communicate? I'm assuming it's a different panel. I don't know. But there's another oral argument next month, I think on the 7th, in the partition case. And I have clearly said in that case, I don't think that case should be before the court, but because there's a judgment, I've got to appeal it. I can't just let it sit there. So to build on Judge Clement's question, she asked whether the tax liability was common property. Was the business, was Abe's, common property? The corporation was community-owned. The stock was in Mr. Tan's name, but the stock was community. Community. Yes. And so the tax liability comes from the company also. It comes from the company because it was the company's tax liability. And then Mr. Tan was under the federal tax law. If you're the one that can control the money, you could be the president, the corporate secretary, the treasurer. If you can write the checks, then you have the responsibility for not paying the taxes. So I guess if the company is community property, would the tax liability not also be a community obligation? My thought is no, absolutely not. Because the corporate debts under just about every state's law are separate debts. It was a corporate debt. The liability, the fraud. Okay. Would the tax liability owed by the company not offset the value of the community property, the stocks in the company? No, because you end up with a corresponding obligation to pay those taxes. I mean, it's not free money because it was a scheme. I didn't want to get too far into it, but it was a scheme. Mr. Tan, and he claims it was really his accountant, he didn't do anything, the accountant did it all. But Mr. Tan set up a scheme where there were three entities, three companies, and what they tried to do was say, one of them is the real employer of the employees, and we're going to treat these people as contract labor, so we don't have to pay withholding taxes on the people. And they pocketed the money. But your position, though, and I'm going to use first names, because it's easy, there's Linda and Hank. Sure. Your position is Linda gets the benefit of whatever her interest is in the company's stocks, but she doesn't bear any of the obligation for the tax liability the company incurred. Well, first, she wouldn't have any liability for any of the corporate debts, but particularly if you talk about benefit, because she wouldn't be liable. She didn't write any checks. She wasn't there. She's home taking care of the kids at that point in time. She's not involved at all in the day-to-day operations. But when you take this money, and we don't know what happened to it, because Mr. Tan controlled it and he took it, when you take that money, you don't just get an asset, you also have a liability to pay the taxes, and that liability didn't go away. Mr. Tan then pled guilty to the tax fraud, and they repaid, they, Aves borrowed money to pay, this is why this is so bad. Aves then borrows money, makes a loan to pay the judgment against Mr. Tan. Whitney then sends the money to the clerk of court in the criminal case to make the restitution. So whatever benefit happened, it got wiped out because they had to then go back and borrow $3.2 million to pay off the tax liability. So at the end of the day, okay, they stole, Mr. Tan stole $3.2 million, then the company had to turn around and borrow $3.2 million to pay it off. So you're at a zero at that point in time. You're not ahead. You're back where you might have been, maybe worse off at that point in time, because you've now got this $3.2 million was after the divorce. Then the company then refinances those debts. They have, I call them, I kind of did a little chart in the briefs, loan one in 2011, that was a company debt, it wasn't a community debt, it was purely a company debt in the course of operations. They then loan two, they borrowed in 2013, they borrowed the $3.2 million. And then in 2014, they then borrow $4.7 million. So we're up from where we started on the taxes. We're another million dollars more than what the taxes were anyhow. They borrow $4,738,000 to pay off loan number two, plus down payment on some boats. Then in 2014, they borrow another $410,000 on there. Then in 2015, they borrow $3,682,000 as new money. So the 2015 loan has nothing to do with the taxes, and it's another $3.6 million. They paid off loan number four, and they paid off loan number one, which is now down to $2 million. And then Whitney has a claim, because they're owed by the time of bankruptcy $5 million, $5,305,000. And Whitney, in their proof of claim, only claimed the 2014 and 2015 loans. They didn't claim anything for 11, 13, 14. Their proof of claim was these 2014 and 2015 loans. And on their books, and as an exhibit, they're the loan histories, they call these new loans. They gave them new loan numbers. They call them one, two, three, four. They even say paid in full for the other loans. This wasn't a traditional refinancing. I worked at a bank for a while in town. And you could do a change in terms. You could say, okay, the interest rate's going to be something else. If you had a multiple indebtedness mortgage loan, you could go up and down in there. But when you take and wholly restructure it and refinance it and add new money and new collateral, you've got a new loan. And that's exactly how Whitney treated these. They treated these as new loans, not existing loans. They didn't treat it, they didn't say it's in a launch, they didn't say it's an amendment. They said they were new loans. So whatever you started out with, even if for some reason, I don't agree, but some reason you say the taxes were a community obligation, I mean, there's a, the Louisiana Civil Code says if you commit fraud against the community, that's not a community obligation. If you're running the community business, you commit fraud. That's your problem. That's not your spouse's problem. And that's what Mr. Tuck did. He did this. Okay. Where the money went, I don't know. Casinos, whatever. I've had clients, I've had a Bourbon Street, I won't mention it, restaurant place. Enormous amounts of money in cash went to Harris. I mean, you know, it's just, I don't know, I don't know where this money went though. So I think that even if you start out with a tax liability, if you make that assumption, and I disagree, but Judge Malazzo thought it was, if you make that assumption, it gets paid. It gets wiped out. It's gone because you refinanced it to loans, two, three, four, five. You can't, you keep rolling it over, adding new boats, adding more debt. They had it down to $2 million. It was up to $5 million. Well, there's $3 million more that wasn't around back in 2013 when they paid the judgment. So at least $3 million is not community. And what's happened is that's all been treated as community. It raises a point because my opponent says that they don't, they don't treat the, yeah, they don't classify the Whitney debt. That's true, but it's not true. They say here's class three, it's community claims. And they don't say specifically at that point that it's a community debt. That's true. But what happens is Whitney votes their claim as class three. The ballot that you get is blank. It doesn't have anything. You can, if you're a creditor, you put whatever you want for whatever class you think you're in. And then the debtor either agrees or disagrees with it and can object to it. But at that point in time when they say we're voting class three, they accept that. And that ballot then fixes the Whitney debt. They voted $1 million as class one. They vote, I think, $3 million or so as class three. And now that, the way the scheme works, it now gets treated as community debt. And I think that is what's improper in this thing. And it's kind of how you, you move from, okay, we don't treat it, but we do treat it. And the trustee is. Your initial time has expired. Thank you. You save time for rebuttal. Thank you. Thank you, sir. Mr. Thurmond. Thank you, your honors. Good morning. May it please the court, my name is Jim Thurmond. I'm here on behalf of the appellee Hank Tunn. Seated beside me is Stuart Peck, lead counsel on the case. I have a whole presentation prepared. However, I'd like to respond to some of the misstatements regarding Louisiana community property law that Linda Tunn's counsel just made. Your honor asked a great question about the loans, the Whitney loans being executed after the community was terminated on the date of divorce. They were executed on those dates. However, under the rule announced and Clemens v. Clemens, post-divorce refinancing of a community obligation does not transform that community obligation into a separate one. Judge Malazzo decided this issue in the partition appeal on the first time, the first time this issue came up. The position Linda Tunn wants to take would make you ignore the fact that those tax liabilities were incurred in tax years 2006 to 2011. In cases that we cited in our brief, the relevant date for tax liability is the date it's occurred. It's not the date an assessment is made. It's not the date that someone pleads guilty to a crime related to taxation. It's the date the obligation is incurred. Well, what about this though? I mean, it occurs to me as we're sitting here, so that the business would have owed taxes and would have owed payroll taxes of some sort, but as far as the judgment against your client for tax fraud, wouldn't there also be penalties, interest, things like that, that would have never really been the obligation of the company if the taxes had been paid? That's a great question, Judge Wilson. I believe that question was decided in the case of Frans v. Frans. On the underlying tax liability, I mean, it's axiomatic that the less taxes that are paid, the more money that's available to the community business and the more revenue could be used to support the lifestyle of the spouses. And this is in a separate record, but I would note that the restitution judgment that Mr. Piper referred to makes no differentiation between taxes, interest penalties, or the underlying tax that was owed. The judgment in the criminal case just this tax liability represents the amount of taxes that were owed, but that were not repaid. That sounds to me like it's the underlying tax liability. And separate and apart from that, Linda Tunn produced no evidence showing, giving a breakdown of what the tax liability was, whether or not there were additional taxes, interest penalties, or fees that would go on top of that amount. Your position is we're not going to separate anything out or parse through the tax obligation would have been or anything. It's all a community obligation. I would say this, Judge. There's nothing in this record that definitively states that there's a portion of that tax liability that would not have been charged against the community anyway. And that's a specific finding that Judge Belazo held in the first appeal of the partition judgment. And I hope that that's an issue we can get into more in depth on Mark 7. However, I would like to add to the questioning from the Court, the extent to which the Hancock-Whitney claim qualifies as a community obligation was not decided by the plan. That was reserved for the claims allowance process. Now, as of the date that the plan was submitted, no one, for approval by creditors, no one had objected to the Hancock-Whitney claim, including Linda Tunn. Pursuant to sections 1126 and 502 of the Bankruptcy Code, a proof of claim to which no one has objected, that's filed in accordance with the Bankruptcy Code and the bankruptcy rules, is deemed allowed. Hancock-Whitney had an unqualified right to vote its claim in support of or in opposition to the plan and to allocate that claim between community debt and separate debt. And I would further add that OCM Energy Holdings representative, who is the assignee of Hancock-Whitney Bank, filed an affidavit to the record in the days before the confirmation hearing in which a at least $5.89 million of the amounts that were due under the loans that were filed. And a representative of OCM Energy Holdings was available to testify at the confirmation hearing. He made himself available all day. Linda Tunn chose not to question him. She had full opportunity to object to the Hancock-Whitney claim and did not do so. In a divorce proceeding that's now outlasted the length of the Trojan War, and in a bankruptcy case that's lasted five years, Linda Tunn has been able to deduce no basis to challenge the Hancock-Whitney claim. At a certain point after all this time, your honors, you have to come to the conclusion that Linda Tunn has not proven out these claims because they have absolutely no merit. I'd like to get to the terms of the plan in this case. It's a simple case. It's a tale of two showings. The first showing is the one that Hank Tunn made. Hank Tunn put on sufficient evidence at the confirmation hearing to show that all the requirements necessary to confirm a Chapter 11 crammed down plan had been met. Two is the showing that Linda Tunn failed to make. She failed to produce any evidence showing any basis the plan shouldn't be confirmed or any cause sufficient to warrant conversion of the case to Chapter 7 or to appoint a Chapter 11 trustee, or that either form of relief would serve the best interests of creditors or the estate. Accordingly, the bankruptcy court, based upon the record that was placed before it, duly confirmed the plan and denied Linda Tunn's motion. I'd like to focus on three points today which, taken together, show why the confirmation order should be affirmed. First, this bankruptcy estate consisted almost exclusively of former community property, including Linda Tunn's one-half interest in that property. Property of the estate under Section 541A2 includes all community property of the debtor and the debtor's spouse. That's an important phrase, and the debtor's spouse. The bankruptcy code brings in all community property. It doesn't say what community property is. That question is reserved for state law. Under Louisiana law, community property is held in end division by the spouses. That is, each spouse has an undivided one-half interest in that property. Those property interests are intertwined and they remain so until a binding partition of the assets is made. That's the first point at which those interests become separated. Until then, they're held in end division. Another important point about Louisiana community property, the interests of the spouses are mere equity interests. Just like shareholders in a corporation, the interests of the spouses in community property are subordinate to the claims of community creditors. Now, Linda Tunn contends that the filing of the divorce petition prior to the bankruptcy prevented her one-half interest in community property from coming into the bankruptcy estate. This court holds that the opposite is true. Henry Robertson, and I quote, community property is used to define property of the estate and Section 541A2 includes community property and former community property that has not been partitioned as of the petition date. This is the black letter law in this circuit. Linda Tunn asked this court to reconsider its 2369.1 of the Louisiana Civil Code, which she construes as recognizing in her favor a separate interest in this co-owned community property. That argument fails for a number of reasons. First of all, the immediately following statute 2369.2 provides that former community property, that is what Louisiana law terms community property from the date of the divorce until the date of partition, community property under 2369.2 continues to be held in indivision. And that's the defining characteristic that brings the non-debtor spouse's interest in community property into the bankruptcy estate. That is, the non-debtor spouse's interest and the debtor's interest cannot be separated until the partition, until a partition is done. Therefore, it all comes into the community. That's the black letter law laid down in the text of this court's opinion in the enactments of the Louisiana legislature. Linda Tunn has shown no basis to depart from that rule. And in fact, the authority she cites only shows why it should continue to apply. Second point, the plan provided the only available means to administer this former community property. All the community property came into bankruptcy estate. The question is what to do with it. The answer, you formulate a plan that adjudicates all claims asserted against the community property that liquidates that property and then distributes the proceeds from the sale to creditors. That's what this plan had to do, and that's exactly what it did. It accomplished these objectives as were required in the Louisiana community property law by structuring classes of claims according to 726C2 of the bankruptcy code. What that section does is it separates the debtor's community property from the debtor's separate property. It devotes community property to the payment of community claims, defining the bankruptcy code as claims against which community property may be used to satisfy those claims. Those have to be paid first from community property. The next sub-estate contains the debtor's separate assets. Now, those go first to parties who cannot assert community claims, and they share on equal if community property isn't sufficient to satisfy, all claims of community creditors, they all share alike in the debtor's separate property. That's exactly what this plan put in force. The most important classes that show this are classes 3 through 5. Now, class 3 encompasses all community claims. They're the first to receive distributions from community property after the Tunn's claims in class 4. As I mentioned, they're mere residual claimants in the community property. This is a principle that was laid down in Henry Cohen's case in California. It's actually laid down as well in Henry Provenza, a case relied heavily upon by Linda Tunn, and in Henry Hendrick, another Eastern District Louisiana case I'm going to discuss a bit more in depth later. Since they're residual claimants, they can't get paid before community creditors. They come first, the Tunn's come next, then you have the debtor's separate creditors in class 5. This is what Louisiana law, as supplemented by the Bankruptcy Code, requires. Now, the Bankruptcy Code had to supplement Louisiana community property. As Judge Wallace Sting recognized in the case of Henry Hendrick, Louisiana community property law is somewhat incomplete. It doesn't necessarily contemplate what to do with insolvent or potentially insolvent states. So the Bankruptcy Code puts in 726C that provides for all these claims to be paid. In that case, just like here, the debtor filed for bankruptcy amidst divorce proceedings in which community property had not been partitioned. The court confirmed a liquidating plan that liquidated community assets, paid off community claims, and then distributed proceeds to the creditors. That's exactly what Mr. Tunn's plan did here. So this isn't a process that was invented out of thin air. There's precedent for this approach in the circuit, and it absolutely works. Linda Tunn showed no basis to hold that anything accomplished through the plan is objectionable. Now, she talks about the Whitney claim a lot, but as I mentioned earlier, the plan does not define the extent to which the Hancock-Whitney claim qualifies as a community claim. It recognizes two things with respect to the Hancock-Whitney claim. It's unqualified right to vote as claimant in support of the plan, and it provides that the Hancock-Whitney claim will be received distributions and classified to the extent that it qualifies as a community claim and classified claims to the extent that it doesn't. Recognizing claims for purposes of voting a plan solicitation are totally, or not totally, but in this case are certainly distinct from recognizing a claim for distribution purposes. Plans often provide for post-confirmation claims objections and a claims allowance process so that the question of whether a claim definitively fits in a class can be answered. That's what's done here. There was a post-confirmation objections period. It wasn't a question at that time that could not be fully answered because the partition case was pending where the claims between the Tunns were at issue and where the extent to which the Hancock-Whitney claim qualifies as a community obligation was at issue. So the remaining objections by Linda Tunn go to Hank Tunn's good faith in presenting the plan. Three grounds. The adequacy of the disclosures regarding the assets to be liquidated under the plan. Two, alleged insider benefits received by Hank Tunn during the bankruptcy case, his bankruptcy case and the companion case of Abesvote Reynolds. And three, the qualifications of Patrick Grove to serve as liquidator under this plan given his prior court approved service as accountant for Abes and for Hank Tunn. She didn't meet her burden on any of these. Okay. First of all, the good faith analysis under 1129A3 is forward looking. It doesn't ask what happened before the case. It doesn't ask what trivial faults may have occurred before the plan solicitation process. The point here is, is the plan a good faith effort to provide maximum recovery to creditors? Hank Tunn met that standard. He introduced liquidation analysis that showed that creditors under his plan stood to receive more money than they would if this case were converted to a Chapter 7. Patrick Grove testified that he was not conflicted or that any potential conflict would not prevent him from fulfilling his duties as liquidator. We cited authority in our briefs and said, you know, conceptual or unsupported challenges to the disinterestedness of an estate professional are not sufficient to disqualify him and are not sufficient to overturn a bankruptcy's contrary ruling under the clearly erroneous standard. Judge Colway made a credibility determination here. He believed Mr. Grove. He believed Hank Tunn. Linda Tunn didn't put on any evidence, didn't introduce or didn't call any witnesses or put on any evidence around any of these issues. So the court rightly overruled the objections that Hank Tunn's good faith and confirmed the plan. Now, there are other serial objections that are listed in the briefing. Without much support, I'd like to go into some of them. She says the Mississippi properties are unencumbered. She didn't put on any evidence to challenge the winning claim, even though she had full opportunity to do so. She talks about whether Hank Tunn provided sufficient information regarding his net income. We absolutely provided a projection of this net income. We gave the estimate that Hank Tunn would be expected to receive during the five-year period the plan would be in effect. It could maximum reach $127,000 a year. We multiplied that by five years. $1,129, A-15 only requires that an individual Chapter 11 plan distribute more property than a debtor, the amount of income the debtor is expected to receive over five years. We showed that. That's set forth in the findings of fact and conclusions of law that the court entered after the confirmation hearing. An important issue there, Linda Tunn talks about how her domestic support obligations, she claims they needed to be paid prior to the hearing. That is not the case. The bankruptcy code 1129 requires only that those payments or those obligations have been satisfied before the plan is confirmed. The plan was not confirmed at the hearing. The bankruptcy court said that he would confirm the plan upon the submission of findings of fact and conclusions of law supplementing his preliminary rulings in court. Those amounts were paid before the order was entered. Lastly, the bankruptcy court properly denied the conversion motion. Now, having filed that motion, Linda Tunn was a movement and bore the burden. She had to prove by a preponderance of evidence caused to convert or appoint a Chapter 11 trustee and that best interest of creditors in the estate. She utterly failed in doing that. The grounds that she presented as cause a momentary lapse in insurance policies, which Hank Tunn testified could be attributed to the fact that the bills for insurance were not being sent to him. We showed that the insurance policies were current. We talked about inadequate disclosures regarding the Magnolia, Mississippi entity. That entity had been disclosed in the disclosure statement. It was an issue that was decided before the plan. It was a formation that was disclosed to Linda Tunn back in May of 2019. All of these things were immaterial to the inquiry that was before the court, which was, does this plan provide the best chance for recovery for creditors? Hank Tunn proved that it did, and Linda Tunn didn't show anything to dispute it. Now, I'd also like to get into another issue. There's a takings argument that was raised here. The first time this appealed on reply. Now, this is an issue that the district court decided. Linda Tunn failed to list any takings issues in her statement of issues on appeal before the district court, and she failed to do so here, too. So, under the Fifth Circuit President, Enrique Clendon and Enrique McCombs, those issues have been waived. Furthermore, and this comes from the authority that Linda Tunn cites, this isn't a takings issue. The cases that she cites, those limited doctrine of gratuitous confiscation definitely would not apply to community property interest, which she wants it to. That was actually in the case of Enrique Wagenz. It's a bankruptcy court case that I included in the 28-J letter that I submitted yesterday. I believe I have addressed all the things that I want to The confirmation order should be affirmed. Ruling in Linda Tunn's favor would require a ruling that the filing of a divorce petition separates community property and grants the spouse's separate interest therein, and total ignorance of the statutes of Congress and the Louisiana legislature, which would plunge Louisiana community property law into free-falling chaos. Two, a ruling in Linda Tunn's favor in this appeal would require disregarding credibility determinations and other factual findings made by the trier of fact regarding the good faith and the other factual elements that were proven by Hank Tunn. Third, a ruling in Linda Tunn's favor would require dashing the interest of creditors with superior claims against the community as recognized in the Louisiana community property law and federal bankruptcy law. Given the highly questionable grounds Linda Tunn raises here, I consider her position as an appeal of the equities. However, the equities have already been served here through the plan. The plan did not disregard Linda Tunn's interests in former community property and treated Hank Tunn's interests therein no better. The plan merely treated both of their interests accordingly as subordinate to the interests of community creditors whose claims are superior to theirs under Louisiana law. Thank you, your honors. As far as 541, I think we both sides agree 541 conveys an administrative right. It's a it's no different than if you had a state court receiver. It's no different than if you had trustee of a trust. It's no different if you had the executor or administrator of the estate. It's a right to administer. It doesn't change the underlying economic interest and that's our point. You've got to have an orderly administration. You've got two people on property and that's part of Provenza again. The court comes in and administers it. What's happened here is Linda has lost her economic interest. So far there's been 1.7 million dollars distributed by the liquidator. Linda's gotten nothing. Whitney's gotten I think a million. Counsel's got $700,000. She's gotten zero out of the way this plan is being administered. Now she did object. She's objected all along to Whitney's treatment. She's objected at the district court. She's objected in bankruptcy court. She objected in her opposition to confirmation and then once the ballots were cast she filed an objection under rule 3007 objecting to the treatment. That was denied by the bankruptcy court and Judge Malazzo denied her appealing that ruling. I guess we could have another adversary proceeding and another case coming before this court one day. My hope and 2012 that's when the partition stuff would have started. The bankruptcy started in 2018. We're almost five years into this case. Right now. Wasn't the partition pressed more quickly? The that was going on in the state court. The parties this was a truly acrimonious divorce. I mean there were six years between the divorce filing and the bankruptcy. Is that how long was taking with the court in Plaquemine Parish? Because of discovery, fighting, arguments, trial dates lost. In fact the the partition trial was scheduled to happen and Mr. Tun filed I think the day before the partition trial was going to happen in state court. So there was an effort to get it done. I think personally I think it should have happened a long time ago. I wasn't involved in it at that point in time. I got involved sometime in 2018. But I quite frankly I think that's an inexcusable amount of time to take to get to the partition. It should have happened long before that. But we're there. You know that Puerto Rico case Colasso says she doesn't lose her economic interest on there. Louisiana law is clear. After the divorce it's treated as co-owned property 2369.1. She doesn't lose that interest in the property. And what's happened because of the way and it's very intelligently cleverly done is with the classification and then the balloting then the recognition of the ballot and the recognition that we're going to now treat this as community debt. The Whitney debt all becomes community. The remaining debt they got a million now the remaining four million is community debt. When it the loans those loans were 2014 and 2015. They just there's can't be community obligations and that's really what's wrong with this case. Whitney was happy to say our proof of claim is for 2014 and 2015. No mention of taxes. It's based upon these two loans. But now it's gone from a post-divorce loans or loans to a community loan when it wasn't made during the existence of the community loan. That that's the violation. You know other things like Mr. Gross he's the accountant for Abe's. He's the accountant for Mr. Dunn. He's now the liquidator. Counsel represents Mr. Gross also. Mr. Gross has settled claims between Abe's and Hank and between Hank and Abe's. He sold business. He sold vehicles to another client. He's convicted all he's conflicted all over the place. I just I don't think he can be an objective an objective liquidator when he's he's represented both both cases. So um you know right now Linda's Town is looking at losing her house next month if your time has expired. Okay thank you. Your case and all of today's cases are under submission.